Good morning, Your Honor. Gretchen Nelson on behalf of the appellant of PharmaRx Pharmaceutical and in the courtroom today are the owners of the company. May it please the court. We come today, and if I could also, Your Honor, reserve three minutes for rebuttal. We're here today to consider an issue of pleading, a question of whether or not the complaint that was filed in this case was sufficient to show the existence of an unlawful agreement between Cardinal and GE Healthcare. I think the court has granted a motion that we filed with respect to Cardinal. A settlement has been reached with them. Cardinal will obviously not be arguing today. GE Healthcare will be. Should the court have any questions about that, I think it's fair to say that the fact that there has been a settlement with Cardinal does not affect in any way the claims against GE Healthcare. This is an antitrust case under the Sherman Act and therefore the parties are equally responsible ultimately if a conspiracy is found. I do have one initial question. You are not challenging the district court's decision about granting leave to a man, correct? We have not challenged it. We have, I think, identified in the complaint, or in the briefing rather, that I think it's fair to say there was some confusion on the court's part about the timing issue, specifically the timing as it relates to the question of when the extension of the patent of CardioLite was to the extent that this court feels that that discrepancy by the district court was one that informed and created the problem, then I think we would ask that the court give leave to amend because those allegations can be made without question. Are there other facts that you could amend to, you could allege if you were granted leave to amend, or have you basically in the second amendment complaint given us what you got? I think it is fair to say that based upon the fact that we had no discovery in the case, based upon the investigation that we were able to conduct, that we have put as good a foot forward as we possibly could. I think the allegations are more than sufficient to be able to show that the existence of an agreement, an unlawful agreement, is as plausible if not more plausible than the fact that it was conduct that was independent and lawful. Can you tell me what allegations of facts your client has advanced to support its claim of a secret term to the 2008 agreement between GE Healthcare and Cardinal? Absolutely, Your Honor. I'm going to answer that question. These are the facts. First off, I think it is our point, and I think we made this in the briefing, this is not a manufacturer-imposed restraint that we're talking about. This is one where the distributor really drives the engine, Cardinal, not GE. There is undoubtedly and undeniably facts in the complaint that demonstrate that Cardinal had a history of imposing exclusive dealing arrangements with its manufacturers, the manufacturer in that case being Cardiolite, which Cardinal used as its flagship brand for many, many years. So you have a situation where Cardinal, who is the dominant player in this industry without question, has for many years enjoyed exclusivity. It enjoyed it from DuPont when DuPont had the patent on Cardiolite. It enjoyed it with BMS, and we have presented the facts in there to show that BMS, in point of fact, was looking to see to protect Cardinal whenever it was asked to grant rights to Cardiolite in an area where Cardinal had a radiopharmacy. But I guess, how is that different from the typical vertical agreements that do not violate the Sherman Act? Because an agreement between a competitor, Cardinal, that was with its manufacturer that is intended specifically to drive out Cardinal's competitors is unlawful. This is also a situation, and we get into this a little bit on the question of whether it's a per se violation or a rule of reason violation. GE stands on both levels of the distribution. GE has its own radiopharmacies, so it is competing with Cardinal, and GE also stands in the role of the manufacturer, where it is selling MyoView to radiopharmacies like my client, PharmaRx, as well as to other radiopharmacies. And so what you have is a unique situation where you cannot have competing entities agreeing to essentially divide a market, which is what they're doing. They're essentially saying we're going to keep out any other independent radiopharmacy and prevent that radiopharmacy from having MyoView so that you, Cardinal, will succeed. And that, so going back to the question that Judge Callahan, you asked me at the beginning, which I understood and I will answer, the facts are the following. Cardinal's history, which is extremely important in this. You also have the fact that for Cardinal, Cardiolite was its primary product. It had used that as its flagship brand for many, many years. It was planning on, when Cardiolite went off patent, manufacturing a generic competing product. So you have an entity with 155 radiopharmacies with 65% of the market, an entity that also had this incredible ability to impose restrictions on the consumer through the SYNTRAC agreements and the supply agreements. And you come to 2008, and all of a sudden, Cardinal decides, hey, we're going to leave Cardiolite in the rearview mirror, and we're going to now go to MyoView. That means Cardinal has to convince its customers to transfer. We have alleged in the complaint facts that show that in point of fact, that's not easy. Physicians have preferences, and physicians are not easy to change, as I think we can all appreciate. So there are differences in the two products. MyoView is one that will allow a greater throughput. You can do more cardiac imaging procedures in a shorter period of time. Cardiolite, on the other hand, provides a greater image, an image that is much more clear and also more focused. So now, Cardinal has to go out. It has to take all of its customers and say to those customers, we want you to change to MyoView. It defies economic sense for Cardinal to do that, unless in exchange, Cardinal is getting something that it needs and wants. And our argument is, the only plausible explanation for that is that it basically got the protection of no competition. There's a further fact that is alleged in here. Cardinal agreed to ever-increasing sales requirements with GE for the MyoView product. So you have now Cardinal selling Cardiolite, selling a generic substitute for Cardiolite, and now it wants to take everyone and convert them to MyoView, and it's agreeing with GE that it's going to do that and provide them with ever-increasing minimum sales requirements. So fundamentally, why would you do that economically, unless you've got what you knew you needed, which is the ability to be the only game in town? Let me ask you this. You sort of introed with this, and I wasn't sure how to formulate the question, but because Cardinal has been dismissed, assuming that we were to find, and this is an assumption because we don't conference before, but let's assume that we find sufficient evidence to support an allegation that Cardinal forced the 2008 agreement upon GE Healthcare. Would the claim against GE Healthcare, based on that determination, survive the dismissal of your action against Cardinal? Yes. They're co-conspirators. It's a very simple process. In the Sherman Act, the violation is a violation of entering into an agreement that affects competition, and our position here is that there can be no dispute that this agreement between GE and Cardinal has, in fact, affected competition. The defendant's argument to that is it didn't affect inter-brand competition, and that's all that we're concerned with. I disagree. First off, inter-brand competition was affected to a certain extent. There has been no generic substitute for MyoView that has ever come into play, and it has now been off-patent since 2010. We're now in 2015. That's a very simple fact to look at, but setting that aside, the tables are turned where we have a situation here, which is a distributor-driven restraint, as distinct from a manufacturer-driven restraint. The Supreme Court in Lesion recognized that and recognized that in situations where you have a manufacturer who basically is forced into positions that they are into, that that is a distributor-driven restraint, and it is anti-competitive, and in fact, we have alleged in the case... Yes, Your Honor? I'll finish at that point, because I have a totally different question I want to ask. We have alleged in the complaint that in point of fact, the net result of what has occurred has been adverse to competition. Physicians are not being given the opportunity to have competition in the products that are available to them. Maybe this is a good point to segue to my question. Am I right in thinking that you would not need discovery to find out if other independent radio pharmacies had also been denied distribution rights in the same way that your client was? You could figure that out, right? We would need that discovery. Okay, that's what I'm trying... Why would you need discovery to figure out if there are other radio pharmacies similarly situated to your clients where they went to GE and said, hey, we'd love to distribute your product, and we're told no. Couldn't you find that out without discovery? We have found some of that out. I think it's fair to say, and that is all in the complaint, what we have been able to locate. Okay, so let me make sure I understand what's in the complaint then. Am I wrong in thinking that you have not alleged a single post-2008 instance in which an independent radio pharmacy was denied distribution rights to MyoView in a market where, I guess it's... The only instances in which that occurred are instances where GE had its own radio pharmacy in that same market? We have alleged in the complaint that certainly our client, post-2008, has been denied MyoView in the Los Angeles market, and GE has a facility there. I would think that there would be, since you're saying this agreement applies nationwide, and Cardinal has a bunch of the most radio pharmacies of anyone else, there must be many instances, if this secret side agreement exists that you're alleging, there must be many instances in which independent radio pharmacies went to GE in a market where Cardinal has a radio And it seems to me that would be very powerful proof, obviously, that that agreement exists, but you haven't alleged a single one of those, and that's what I wanted to make sure I'm clear on. It is true, Your Honor, that in the complaint, the allegations of denial of MyoView for pharmacies other than Pharma Rx, the plaintiff in the case, are pre-2008. There are compelling points to be made about those, not the least of which is that in 2007, and this is the instance that occurred in Spokane, there, the entity that was opening up to compete with Cardinal, where Cardinal is the sole source, GE has a facility, but I believe that facility is about 200 miles away in Seattle, in Spokane, the company that was opening up to compete with Cardinal, Radio Pharmacy was informed that they would be allowed to have MyoView. At the time, Cardinal was, or Cardinal's location in that area was selling 95% Cardiolite and 5% MyoView. It's an extraordinary differential. Okay, but your time is running down. I just want to, why, why if this secret side agreement exists, just give me an explanation so I can put this doubt about your, you know, the merits of your case aside. If the secret side agreement exists, why have you not been able to find more instances in which independent radio pharmacies were denied distribution rights? Well, I could, I suppose I could say that although we've done as best we can, there are constraints in terms of timing and the filing of the complaint. I can only say that we reached out and we undertook an investigation. We simply don't have that, but I would often offer, obviously, that we would undertake to find that out in discovery. I don't think, however, Your Honor, that that is dispositive, because I think the facts still compel a very strong inference that at least is plausible, if not more plausible. It certainly is not implausible under the Starr versus Baca theory that Cardinal and GE entered into an agreement. Cardinal, and I've articulated... All right, I'm going to, I'm going to, you've used your time, but I'll give you two minutes for rebuttal since we had a lot of questions. Thank you very much, Your Honor. Good morning. Good morning. Thank you, Your Honor. Jonathan Gleckman for GE Healthcare. May it please the Court. Your Honor, the District Court properly dismissed this case after giving PharmRx three bites at the apple, literally three bites at the apple, and they still did not come close to satisfying the test in Twombly and Iqbal. All we are left with is a bare bones, and it is the ultimate in bare bones allegations on, excuse me, on information and belief that there was this secret codicil to a regular old distribution agreement between GE and Cardinal, that there was this secret codicil and this secret agreement not to compete. That's just not plausible. It's not consistent with the facts. Why would, why would Cardinal agree to the minimum sales requirements if, if it didn't have the assurance that it was going to basically be able to get monopoly profits on distribution in my view? Okay, a couple of things, Your Honor. First is Cardinal had been seeking broad distribution rights for years and GE hadn't granted them. That was the incentive that they gave to GE. GE's position all along has been when we have distribution in an area, we don't get a lot of benefit from having two or three or four people able to distribute it. Sometimes these drugs have shortages and if it's in the wrong distributor, it's not good. Cardinal came and said, because Cardiolite was going off patent, we want a new product. We really, really, really want distribution. And GE said, well, what's in it for me? Cardinal said, tell you what, we'll agree, we'll give you, we'll commit to increasing volumes. Wait, but that, that's not right there. That makes no sense for GE to say what's in it for me. What are you talking about? They, Cardinal controls the majority of the market. You need them to distribute your product, don't you? We don't. Until 2008, some Cardinal outlets had distribution rights. Cardinal is an agglomeration of prior acquisitions, so some of the radio pharmacies that they acquired had distribution rights. GE was doing just fine without having Cardinal distribute its product. The key, Your Honor, is there's no allegation. All we have is the uninformation and belief. There's no allegation that GE didn't want Cardinal to distribute it. There's no allegation that Cardinal forced GE. That's all in the reply brief. In this court, it wasn't even raised in the district court, the idea that GE, to be honest, Your Honor, the idea that GE got coerced, GE, an $80 billion company, got coerced by Cardinal. I think it makes perfect sense. I mean, the Huffingham materials that the plaintiffs rely on are quite persuasive. I mean, there aren't a lot of instances in case law that line up with these facts, but the market conditions he describes in which the distributor-imposed restrictions would take are exactly the kinds of conditions in this market. Your Honor, I respectfully disagree. Huffingham identifies a couple of things that would be inconsistent. First is, this wasn't an exclusive. Cardinal didn't get the exclusive. GE was already in the areas where it was, and there's no allegation that all of the distributors that had rights before Cardinal got rights, that those rights were terminated. The other thing is that GE protected itself and protected consumers by having this take or pay provision, by requiring Cardinal to increase output, and a read it talks about, you can figure out whether this is an output restraining agreement or an output enhancing agreement, because if the distributor has market power, they're going to force exclusivity and drive down output and raise prices, and that would be bad for the manufacturer. Here they didn't drive down output or raise prices. Here they committed contractually to increasing output. So there's no reason to think that GE was pushed by Cardinal to do something it didn't want. Cardinal said, we're going to increase output of your product. It's perfectly rational for GE to give Cardinal distribution rights in that case. Your Honor, the other thing that makes it GE's conduct here, you identified exactly the issue. What's really going on is that GE doesn't give distribution rights where it already has a pharmacy, because while it agreed to give it to Cardinal as part of this nationwide agreement where Cardinal agreed to increase output, in general, GE doesn't want to create competition for itself, and under the antitrust laws, people have no obligation to create competition for itself. The complaint expressly alleges that if only GE had agreed to give pharma RX distribution rights, its sales and profits would have gone down. Why do you need a conspiratorial explanation for GE to do something when the complaint itself alleges that if GE did it, it would have made less money? There's no reason to look under rocks for these secret codicils with non-compete agreements when the complaint itself alleges that it would have been irrational for GE to... Am I right? I think I'm right, given the answer I heard from plaintiff's counsel, but the complaint does not allege any instances post-2008 in which GE denied distribution rights in a market where it didn't have its own... That's correct. In fact, it doesn't allege any other, other than pharma RX itself, whether there was GE there alone or... I thought there was some Arizona thing. Am I wrong on that? That was before 2008, I believe, Your Honor. Let me ask you this. If pharma X was not privy... As pharma X was not privy to the 2008 agreement, or the negotiations leading up to that agreement, what type of factual allegations would it have to make to sustain that the agreement was an agreement? What type of factual... So the normal circumstantial evidence of a conspiracy is there's a before and there's an after, right? The price of widgets was $4 and then the trade association met, and then the price of widgets went up to $7. In this case, as Judge Watford noted, all along GE's policy was we don't give people distribution rights. Long before the alleged agreement was reached, GE had a policy of not giving people distribution rights. So there's no before and after here. There's a before and before. The conduct never changed. There's no... There's nothing hard to explain here. That's the usual circumstance where somebody does something that doesn't make sense absent a conspiracy. It's contrary to their own self-interest. And here the complaint itself alleges that GE was acting completely consistently with its own self-interest, not to let pharma RX open a competing pharmacy, whatever it was, 7 or 8 miles away from GE's own location. Let me ask you this. I'm going to ask you to make an assumption that you're not going to want to make, but I want the answer. Okay. So if we just assume that if we were to find that Pharma X's claims were otherwise adequately pled, which of any of its claims against GE Healthcare survived in light of the dismissal against Cardinal? So there were lots of claims that were only Cardinal conduct, the Syncor agreements and things like that. Counsel was correct. Under the antitrust laws, it takes two to tango and the victim, even if GE was coerced into agreeing to an agreement, we would be jointly and severally liable. However, even if there were an agreement, as we argue in our briefs, and this was not a point that the district court reached, but it's a proper grounds on which you could affirm even if you found an agreement. This agreement would have been perfectly lawful. A vertical exclusive distributorship, and it's not even an exclusive because GE had its own stores and there are other radio pharmacies, but this vertical agreement is an intra-brand restraint with no harmed inter-brand competition. There are multiple inter-brand competitors. GE's Cardiolite is, in the words of their brief, a bit player with about a 27% share. I'm sorry, GE's Myovia. We compete with Cardiolite, we compete with Thallium, we compete with the generics. There's nothing about this agreement that makes life harder for those competitors. Counsel said, well, as a result of this agreement, there's been no generic entry on GE's Myovia. Well, first of all, that's not what's alleged in the complaint. There's no but-for causation and any allegation of causation would be nonsensical. If Pharma RX doesn't have the rights to distribute Myovia, they would be dying to distribute a generic Myovia. The reason there's no generic Myovia is apparently because the market is either so competitive that nobody wants to make a generic or it's too hard to make, but there's no reason that anybody should think they can't get distribution because of the extent that GE has refused to grant distribution rights. You've got all of those radio pharmacies out there who are dying, who are, at least according to the second amended complaint, dying for this other product. So this is an intra-brand restraint. This is about who gets to distribute GE's product. The antitrust laws would be entirely indifferent if GE's policy was the only place you can get Myovia is in a GE pharmacy and we're going to exclude all other competition. That would be perfectly fine. That's an intra-brand restraint. Their brief acknowledges that this is an intra-brand restraint, but they say, well, it's kind of inter-brand because we sometimes will, radio pharmacies will sometimes switch doctors or patients from one product to another. That doesn't make it an inter-brand restraint any more than when, you know, Coke has an agreement with a grocery store. That's a vertical intra-brand restraint. Sometimes grocery stores will promote Pepsi and not Coke and Coke not Pepsi. That doesn't mean that's an inter-brand restraint. Inter-brand would mean affecting competition at GE's level between GE and the other people who make radio pharmacies, radio pharmaceuticals. This is just a straightforward intra-brand restraint and the antitrust laws are indifferent to agreements, even if there were one, that affect only intra-brand competition where the manufacturer has, according to their allegations, a 27% share. Can I ask you, is there something in the record that spells out specifically what the terms of the, I think you referred to as the take or pay provision of the agreement? There's nothing that specifically spells out the terms other than alleging that Cardinal agreed to increasing obligations to distribute. It doesn't say that if they didn't meet that, that they'd have to pay versus the agreement simply being terminated. In fact, the agreement is a take or pay, but there is the allegation that there were increasing obligations to distribute ever increasing quantities. In this context, what does take or pay mean? Well, again, it's not what's alleged. What the actual agreement is, we say to Cardinal, you have to distribute X thousand doses and if you don't distribute X thousand doses, you're going to pay us as if you did. So you might as well distribute them because you're going to pay us for those doses whether you take them or not. Counselor, are you aware of any exclusive distributorship cases in the antitrust field in the past 20 years, appellate cases, where an exclusive distributorship has actually been struck down? I'm not aware of one in the last 50 years, Your Honor. If you look at Schwinn, which was perhaps the high point of hostility to vertical restraints, that's the case that got overruled in Sylvania. Schwinn applied a per se rule. Even the court in Schwinn says exclusive distributorships where there are other suppliers available are not anti-competitive. They're basically not within the scope of the antitrust laws. So no, if there were a case, I'm sure my colleague would have found it and cited it. I don't believe it exists. These vertical exclusive distributorship cases, it's the Chicago school revolution, but it was happening long before the Chicago school, Your Honor. Manufacturers get to decide how they want to distribute their products, and absent some theory of harm to GE's competitors like CardioLite or the generics, there's just no theory here. We don't appear to have any additional questions. You do have some time if you want to use it, but it's not necessary if you don't want to. I'm all done if you are, Your Honor. Thank you. Thank you, Counsel. Perhaps I can take his time. Thank you, Your Honor. Let me just take a few moments to take us back. We're here on a motion to dismiss. Starr v. Baca informs us that the question really is, are the facts as alleged plausible or present a plausible argument for an antitrust conspiracy? This is not the Bell v. Twombly type of case. This is a case where there are facts. Our view on it is we have presented facts that present a plausible argument that there was an agreement. Based upon Starr v. Baca, we would ask that the court reverse and send the matter down. My opposing counsel says that this was three bites of the apple. It was two. Well, you filed the first one, and then you got two times to amend. So the first one counts as bite. It does. If a dog bites and then bites again and bites again, that's three. That's correct, but if the dog's bite solely captures your shoe and not your skin, there's a distinction. I know, but when you file a complaint, you would certainly be filing one that you thought would live. We did, but what I think is important for the court to understand is that the first was a result of an argument by Cardinal that there was no personal jurisdiction over it. And that was the sole issue that we informed the court, the district court, that we would amend on. And that was all that we did. We made no other allegations. The court asked us, and we did not. So I take issue only to the point that there's an argument that somehow or other the First Amendment complaint was something different than the original. Its difference was only on the jurisdictional allegations as to Cardinal. You need to basically wrap, because I've given you additional time, and you're down to seven seconds. I appreciate that, and my only point is this. It makes fundamentally no sense, under the allegations that we have, for GE, who although counsel says was doing just fine, in Spokane was selling five percent of Mile View, and the balance was Cardialite. It makes no logical sense for them to enter into an agreement other than to provide, at the whim of Cardinal, who was the dominant player. And I think those are the facts that are extremely important. And I thank the court very much.
judges: Callahan, Watford, Owens